(No. 18685.—)

Andrew Lino *et al.* Defendants in Error, *vs.* The North-western Pacific Railroad Company, Plaintiff in Error.

*Opinion filed October 25, 1928.*

John A. Sheean, for plaintiff in error.

J. V. Delaney, for defendants in error.

Mr. Commissioner Partlow reported this opinion:

Defendants in error, Andrew Lino and Lee W. Wolfe, began an action of assumpsit in the circuit court of Cook county against plaintiff in error, the Northwestern Pacific Railroad Company, to recover the value of 930 lugs of grapes shipped from Ross, California, to Summerville, Massachusetts, and re-consigned in transit at Chicago to Akron, Ohio. Plaintiff in error filed the general issue, with notice of special matters relied on for defense. A jury was waived. It was agreed that if there was any liability the damages were $800. The court found against plaintiff in error, judgment was entered for $800, which was affirmed

by the Appellate Court for the First District, and the case is before this court on a writ of *certiorari*.

As grounds for reversal it is urged that the Petaluma and Santa Rosa Railroad Company was the initial carrier under the Carmack amendment to the Hepburn act, and plaintiff in error was an intermediate carrier and could not be held liable under the Carmack amendment for damages shown at any point other than at Schellville, California, where the car was turned over by plaintiff in error to the connecting carrier on the route to its destination. Defendants in error insist that the Petaluma and Santa Rosa Railroad Company was not the initial carrier; that it is an electric line; that no attempt was made to show that it was engaged in the general transportation of freight, but, on the contrary, the evidence showed that it owned no cars and the occasional cars which it used were borrowed from other lines; that it was not liable for the damage in question.

The material facts were stipulated and there is no controversy as to them. Some evidence was taken on both sides but there is no material conflict in any of it. The Petaluma and Santa Rosa Railroad Company is an electric road and is thirty-eight miles long. It had stern-wheel steamers operating between San Francisco and Petaluma, a distance of thirty-nine miles. Among its officers was a general freight and passenger agent. At Gravenstein, Santa Rosa and Petaluma, California, it connected with plaintiff in error. At San Francisco it connected, via river steamers, with the Western Pacific Railroad Company and all steamer lines diverging. It was a member of the freight claim division of the American Railways Association. It advertised transcontinental freight rates, both east and west, to and from all points on its line except San Francisco, via established routes; that all matters pertaining to freight claims should be addressed to its general freight and passenger agent; that traffic handled in connection with the Western Pacific Railroad Company must be routed via Salt

Lake City. The consignment in question started from Ross, California, on the line of the Petaluma and Santa Rosa Railroad Company. The car was ordered by the shipper, V. D. Ely, from that railroad on October 5, 1920, to be placed at Ross on that date, and it was so placed. No particular kind of a car was ordered. The shipper did not commence loading until October 8, and the car was released to the carrier at 2:15 P. M. on that day. The grapes were loaded in a box-car of the Chicago, Milwaukee and St. Paul Railroad Company. It was stipulated that it was impossible for the Petaluma and Santa Rosa Railroad Company to furnish the shipper a refrigerator car on the day in question without working a discrimination against other shippers in that vicinity; that there was a car shortage, and the railroad followed an established practice of pro-rating available refrigerator cars to its patrons according to the priority in which orders were placed and in accordance with the number of cars required by any given shipper. The car was billed from Ross to the shipper at Petaluma in care of plaintiff in error. A standard form of bill of lading was issued by the Petaluma and Santa Rosa Railroad Company, which showed on its face that it had been approved by the Interstate Commerce Commission. It was stipulated that it was the intention of the shipper, when the car was delivered to electric road at Ross, to have it transported to Summerville, Massachusetts, via the route it actually took, to a destination beyond the California State line. Under the rules of carriers applicable to so-called prepay shipments, the freight charges would have to be paid in advance unless the shipper had on file with the initial carrier a bond guaranteeing payment. The shipper in this case had a bond with plaintiff in error but not with the Petaluma and Santa Rosa Railroad Company. He billed the shipment to Petaluma and prepaid to that point the local freight charges, amounting to $53.97. It was stipulated that his purpose in doing this was to avoid the necessity of prepaying the

freight to Summerville. The car left Ross at 3:00 P. M., October 8, and was delivered to plaintiff in error at Petaluma at 9:30 the same evening. The shipper was notified the next morning and during the day ordered it re-shipped to Summerville in the same car without making a request for another car. The car at Petaluma was transferred to plaintiff in error without being unloaded and without breaking the bulk. On the same day a bill of lading was issued by plaintiff in error, but the shipper had placed his order for the shipment too late for the regular daily train on that date and the car went forward on the first available train the next day. The shipment first went from Petaluma to Schellville, a distance of fifty-one miles, over the line of plaintiff in error, was there transferred to connecting carriers, and arrived in Chicago on the morning of October 21, 1920. The consignee was notified, and on the following day the car was re-consigned to Akron, Ohio.

On the face of both bills of lading the shipper agreed that the goods were to be shipped in a box-car because the originating carrier had no available refrigerator cars, and all claims for loss or damage on account of the insufficiency and improper equipment, lack of refrigeration or ventilation in transit were waived. There was no difference in the freight rate on grapes shipped in a box-car as distinguished from a refrigerator car, but there was an extra charge of $90 per car for refrigeration. The shipper's written instructions as to ventilation were, that the doors should be cleated open for ventilation and sealed with loop-seals right and left. The railroad company showed that these instructions were fully complied with. The inspection at Chicago showed that the grapes were in a badly decaying condition, which was partly due to insects in the grapes.

Prior to the passage of the Carmack amendment the Federal rule was that each carrier in an interstate shipment was only bound to safely carry over its own line and safely deliver to the succeeding carrier. (*Railroad Co.* v. *Manu-*

*facturing Co.* 16 Wall. 318; *Myrick* v. *Michigan Central Railroad Co.* 107 U. S. 102.) The Federal rule was changed by the Carmack amendment, which is section 8604A of the United States Compiled Statutes of 1918, and provides, in substance, that any railroad company subject to the provisions of the act, receiving property for transportation between the States, shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it, or by any common carrier to which such property may be delivered or over whose line such property may pass. No contract or other limitation of any character whatsoever shall exempt such common carrier from the liability imposed. Any such common carrier shall be liable to the holder of said receipt or bill of lading, or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the damage to such property caused by it or by any such common carrier to which such property may be delivered.

In *Georgia, Florida and Alabama Railway Co.* v. *Blish Milling Co.* 241 U. S. 190, and *Oregon-Washington Railroad Co.* v. *McGinn,* 258 id. 409, it was held that the Carmack amendment modified the common law liability of the initial carrier, only, and rendered that carrier liable not only for damage to the property while in the possession of the initial carrier, but also rendered the initial carrier liable for damage occasioned by any connecting carrier; that the connecting carrier was not relieved from liability by the amendment for negligence or loss occasioned upon the line of the connecting carrier and due to the negligence of the connecting carrier. This rule was recognized by this court in *Pennington* v. *Grand Trunk Western Railway Co.* 277 Ill. 39.

Section 15 of the Interstate Commerce act provides that the commission shall not establish any through rate or classification between straight electric passenger railroads

not engaged in the general business of the transportation of freight in addition to their passenger and express business, and railroads of a different character. In *United States* v. *Hubbard,* 266 U. S. 474, it was held that the power of the Interstate Commerce Commission to require an increase of intrastate railroad fares which subject interstate commerce to unjust discrimination, extends to interurban electric railroads engaged in interstate commerce although not operated as part of a steam railway system or engaged in the general transportation of freight in addition to their passenger and express business. To the same effect is *C. I. L. Ry. Co.* v. *United States,* 270 U. S. 287.

In *Texas and New Orleans Railroad Co.* v. *Sabine Tram Co.* 227 U. S. 111, it was held that shipments on local bills of lading from one point in a State to another point in the same State, destined from the beginning for export, are foreign and not intrastate commerce. Merchandise destined for export acquires the character of foreign commerce as soon as it is actually started from its destination or delivered to the carrier for transportation.

In *Baltimore and Ohio Southwestern Railroad Co.* v. *Settle,* 260 U. S. 166, it was held that whether a shipment of goods is interstate, and therefore subject to the rates provided by the carrier's interstate traffic, depends upon the essential character of the movement, and this character is not necessarily determined by the contract between the shipper and carrier. Neither through-billing, uninterrupted movement, continuous possession by the carrier nor unbroken bulk is an essential of an interstate shipment, though these are common instances of through shipments, and their presence or absence may be important evidence of the intention with which a shipment was made when that question is at issue. Where the shipper bills his goods from one State to a point in another State, paying the interstate rate, and after receiving delivery of the loaded cars at the latter point re-ships them within a few days to another point in the

second State on local billing, paying the local freight rate, intending throughout to move them to this destination from the point of origin and interrupting the movement only that he may take advantage of a difference in his favor between the through rate and the sum of those paid, his intention, thus carried out, determines, as a matter of law, the essential nature of the entire movement as a movement of interstate commerce, citing *Southern Pacific Terminal* v. *Interstate Commerce Com.* 219 U. S. 498, *Ohio Railroad Com.* v. *Worthington,* 225 id. 101, *Railroad Com. of Louisiana* v. *Texas and Pacific Railroad Co.* 229 id. 336, and *Baer Bros. Mercantile Co.* v. *Denver and Rio Grande Railroad Co.* 233 id. 479.

There is no dispute as to the material facts in this case, therefore the question is whether or not the undisputed facts show that the Petaluma and Santa Rosa Railroad Company was the original carrier, and thus liable for the shipment, or whether plaintiff in error was the initial carrier and was liable. The undisputed evidence is that the Petaluma and Santa Rosa Railroad Company was engaged in handling freight, the grapes were delivered to that railroad, a bill of lading which had been approved by the Interstate Commerce Commission was issued to the shipper, the shipment was to be delivered at Petaluma to plaintiff in error, and it was the intention of the shipper that the final destination of the shipment should be Summerville, Massachusetts. The Interstate Commerce act makes the original carrier liable for any damage occasioned, whether it is on its own line or on some other line. The undisputed facts in evidence bring this shipment within the rules of law above stated. The Petaluma and Santa Rosa Railroad Company was the initial carrier and was liable for any damage in the shipment until it reached its destination, while plaintiff in error was only liable for loss occasioned on its own line. There was no evidence of loss on the line of plaintiff in

error, and the judgments of the trial court and of the Appellate Court were erroneous.

Other questions are urged, but as plaintiff in error was not liable as an initial carrier it will not be necessary to consider them.

The judgment will be reversed and the cause remanded.

Per CURIAM: The foregoing opinion reported by Mr. Commissioner Partlow is hereby adopted as the opinion of the court, and judgment is entered in accordance therewith.

*Reversed and remanded.*