**BALTIMORE & O. R. CO. et al. v. UNITED STATES.**

District Court, N. D. New York.
Aug. 9, 1938.

Before L. HAND, Circuit Judge, and COOPER and BRYANT, District Judges.

Elmer B. Collins, of Washington, D. C., for the United States.

. E. M. Reidy, of Washington, D. C., for Interstate Commerce Commission.

Harry C. Ames, of Washington, D. C., for complainants.

Daniel P. Loomis, of New York City, for plaintiffs.

L. HAND, Circuit Judge.

This suit is in substance the same as Baltimore & Ohio R. R. et al. v. United States, decided in July 1936, by a court composed of the same members. Baltimore & O. R. R. et al. v. United States, D. C., 15 F.Supp. 674. No appeal was taken from the decree entered therein, but the complaining shippers asked the Commission for a rehearing in the hope of strengthening their position. At the conclusion of this the Commission again passed an order, practically identical with the first, requiring the roads to cease from asking unreasonable rates upon the carriage of methanol, when refined·in transit at Cadosia, and to maintain fifth class rates, said rates·to be predicated upon distances via Cadosia over the shortest routes available. The roads then brought this suit to enjoin the second order, and the case is once more before us. The defendants argue that the record now at bar is substantially. different from the first, both in the proof as to the billing of the methanol, and as to the products of the third distillation—that at Cadosia. There are indeed some differences, but in the view we take they are not important, and we may refer to the statement of facts made in the former case as sufficient for our present discussion. In our first opinion we spoke of the effect of "transits" upon such situations as those at bar, and declared that they could "never be used as a constitutive element" of the power to regulate interstate commerce. This conclusion the defendants ask us to change, and it is reasonably clear that the Commission not only did not agree with us, but declined to follow us, and entered the order now on appeal for that reason. Upon further consideration we have come to believe that they are right, and that we were wrong. A "transit" is a stop-over privilege granted by a carrier, by which a break de facto in the continuity of carriage of goods is disregarded, and two legs of a journey are treated as though they were covered without interruption: It unites both legs into a "through route", for which a joint rate can be published. Indeed, while there could be no purpose in allowing a "transit" without a joint rate, theoretically it would be·possible to treat an interrupted carriage as being over a "through route" by the aid of a "transit" even when the rates remained a combination of local rates. For a time one of the·plaintiffs by mistake did just that.

In a number of instances the plaintiffs have published joint rates to go with a "transit", granted by the New York, Ontario & Western R. R. at Cadosia, on methanol hauled between two points,·of which one is in one state and the other in another; but they refuse to do so between the points involved in this proceeding, for which routes they publish combination, or "two-factor", rates that are higher. They deny that their grant of "transit" in the first group of routes has any relevancy to the second, and insist that as to these the case

must be judged merely by what happens at Cadosia. We decided in the first suit that the carriage was interrupted at that place, because the crude methanol was there manufactured into a new product commercially. For this we especially relied upon Arkadelphia Milling Co. v. St. Louis South Western Ry. Co., 249 U.S. 134, 39 S.Ct. 237, 63 L.Ed. 517. We shall not reconsider that conclusion, but assuming it to be correct, confine ourselves to the effect of the "transit". We shall first consider how far in fact it established a "through route" between those points where it was granted, and then how far that affected those routes where it has not been granted.

No one maintains that the question of what is continuous carriage in general turns wholly upon the external incidents of transportation. There are pauses in the carriage of all goods; some for very substantial periods; some involving breaking of bulk; some repacking the goods; some even submitting them to an added process. Even when there is no "transit", many of these do not interrupt the continuity of the carriage; the most striking instance, perhaps, is Southern Pacific Terminal v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310. The reason why such interruptions are held not to break continuity is because of the intent of the parties at the outset to unite all parts of the carriage; and that intent—while not alone conclusive, because no one element is that—is probably the most important single determinant of continuous carriage, and therefore of "through routes". Baltimore & Ohio S. W. R. R. Co. v. Settle, 260 U.S. 166, 43 S.Ct. 28, 67 L.Ed. 189. The importance of the publication of a joint rate with "transit" is that it shows beyond peradventure that the parties do intend so to unite the legs of the journey. The practice antedated the existence of the Commission itself, and has been recognized by it over and over again in instances too numerous to cite. Much of the business of the country is conducted upon the assumption that it is effective to create "through routes" which would not otherwise exist, and for the reasons we have just given that result follows on principle. It is true that the Supreme Court has not yet definitely passed upon the point, though in Baltimore & Ohio S. W. R. R. Co., supra, 260 U.S. 166, 174, note, 43 S.Ct. 28, 31, it appears to recognize that "transits" may be a determining factor of continuous carriage. In Atchison T. & S. R. R. Co. v. United States,

279 U.S. 768, 49 S.Ct. 494, 73 L.Ed. 947, it also seems to have assumed (page 780, 49 S.Ct. page 498) that a "transit" might have that result even when grain is ground into flour at the transit point, which is more of a physical and commercial change than refining crude methanol. Moreover, it did not hold that the grain in question was not still in through shipment while pausing at Kansas City; but only that at Kansas City no one could say that it had from its departure at Dodge City been en route to the Gulf. Here it is not material to learn where the methanol is going, but only that it is upon some through route which crosses a boundary of New York. We are therefore free to hold that the "transit" in this case did create a "through route", and we think that it did. It must be remembered that we are dealing with a case in which the effect of the interruption is on the border line: it does not follow that there may not be breaks which no "transit" can bridge.

[6] We understand that the plaintiffs admit that "through routes" exist between those points where they have granted a joint rate with "transit" at Cadosia; but they say that between points where they have not done so, the carriage is not continuous, and that over these the Commission has no jurisdiction. Their argument may be most forcibly put as follows. The two legs of the carriage are so separated by distillation and confusion of ownership, that only the carriers' intent can unite them; their intent to do so being manifested by publishing a joint rate with "transit". Where they have not manifested any such intent, the Commission has no jurisdiction, because a reasonable joint rate can be fixed only in case a "through route" exists. Virginia Railway v. United States, 272 U.S. 658, 666, 47 S.Ct. 222, 225, 71 L.Ed. 463. The Commission has power to establish "through routes" under Interstate Commerce Act, section 15(3), 49 U.S.C.A. § 15(3), but for that a hearing is necessary and a finding of public interest. The order at bar is therefore invalid. This reasoning proves too much, because followed consistently it would prevent the Commission from establishing any "through route" via Cadosia at all. It assumes that the jurisdiction of the Commission depends upon the manifestation of an intent to treat as continuous carriage, what is not in fact a continuous carriage; but the Commission would have no power to supply that fact, if it did not exist. And if it had not, it could not establish a "through route" because by

hypothesis there would be no continuity of carriage and part of the putative route is intrastate over which their jurisdiction does not extend. There must be some continuity for the Commission to act upon, either actual or by virtue of an expressed intent. The defect is jurisdictional; indeed constitutional. The answer seems to us to be as follows. We may assume that, had the carriers consistently insisted upon treating the refining at Cadosia as in all cases an interruption of the carriage, they would have been on firm ground. They did not do so, they established "through routes" for part of the routes, although those where they refused to do so are precisely alike. It is true, therefore, that they do not in fact intend to make these routes "through routes", and if that fact were inexorably a condition, its absence would be final. But we think that it is not such a condition after the carriers have, against their own interest, declared an opposite intent as to the very same interruption. The law may and should impose upon them a duty to apply that decision consistently: it should not leave them free to choose at all unless they choose without caprice. In the interest of harmony and equality it may insist that the power shall not be exercised arbitrarily with a single eye to the carriers' advantage. We hold therefore that having made "through routes" between some points, the plaintiffs made "through routes" between all. Once it is established that the traffic moves upon "through routes", the jurisdiction of the Commission is undoubted. Virginia Railway v. United States, supra, 272 U.S. 658, 666, 47 S.Ct. 222, 225, 71 L.Ed. 463.

Bill dismissed.